UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LEIGH ANN KUHN and ROBERT KUHN, SR.,

Plaintiffs,

v.

WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES; DAVID W. ROTHSCHILD, in his individual capacity; LEWIS COUNTY SHERIFF DEPARTMENT; HAL SPROUSE, in his individual capacity; and R.K. BISHOP, in his individual capacity,

Defendants.

Case No. C04-5294RBL

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. SUMMARY

This matter is before the court on two Defense Motions for Summary Judgment: one Motion by Defendants Washington State Department of Social and Health Services ("DSHS") and David Rothschild ("Rothschild") [Dkt. #42] and the other by Defendants Lewis County Sheriff Department and Deputies Hal Sprouse ("Sprouse") and Robert Bishop ("Bishop") [Dkt. #69]. Plaintiffs allege claims under 42 U.S.C. §1983 as well as a Washington State law negligent supervision and training claim.

The specific details of the event depend on the various accounts of the individuals involved,

ORDER- 1

and the parties have submitted voluminous materials supporting their respective version of the facts. For purposes of this motion, the Court must view the facts in the light most favorable to the Plaintiffs.[1]

On January 25, 2002, DSHS received a Child Protective Services ("CPS") referral from Matt Whitmire, a school teacher, concerning Plaintiffs' four children. Deposition of David Rothschild, attached to Declaration of Daniel R. Fjelstad as Exhibit B ("Rothschild Dep."); *See also* Exhibit C [Dkt. #57]. The names and ages of the children at the time in question were N.K., 14 years, A.K., 13 years, T.K., 9 years, and R.K., 7 years. Declaration of Daniel R. Fjelstad, Exhibit C. CPS intake gave the referral a moderate high risk tag, non-emergent, and the case was assigned to Rothschild. Rothschild Dep., at 31.

Rothschild took his first action regarding the case on January 30, 2002, when he drove to the Kuhn residence. Rothschild arrived at approximately 4:00 p.m. and parked his Jeep on the side of the street. *Id*. at 39-40. Rothschild exited the vehicle and was approached by T.K. and two of her friends. He identified himself by name and stated that he worked for CPS, but did not explain why he was there. *Id*. at 43-44. The girls responded by yelling, "kidnapper, kidnapper" and running down the street. Rothschild yelled at the girls, asking them to stop, but they refused. *Id*. at 44-47.

Rothschild proceeded onto the property and approached the motor home by walking through mud. *Id*. at 47-48. Rothschild got to within 50 to 75 feet of the motor home when the three girls ran past him still yelling "kidnapper." *Id*. at 50. From this location Rothschild observed the conditions around the motor home and determined that it was "not a good situation." He did not feel it was in his best interest to venture any closer. *Id*. at 50, 57. Rothschild based this assessment on his observation of a fire pit outside the door of the motor home and some garbage strewn about. *Id*. at 51-52. By this time A.K. and R.K. had emerged from the trailer. Rothschild returned to his

---

[1] *Parks Sch. of Bus. Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)

ORDER- 2

Jeep without speaking to A.K. or R.K. *Id.* at 60-61.

Rothschild entered his Jeep, shut the door, and proceeded to place two telephone calls. The first call was to Central Dispatch to request a sheriff's deputy. Based upon the referral and what he observed, Rothschild believed that he may need a deputy to take the children into custody. *Id.* at 62-64. Rothschild placed a second call to his supervisor to request the assistance of an additional social worker in the event the children had to be transported. *Id.* at 64-65. He also asked his supervisor to arrange receiving homes for the children should they be taken into custody. *Id.* at 178-179. Rothschild felt that it was necessary to make such arrangements at that time because he "knew that we were going to be past 5:00 by the time I would be able to make [the removal] decision." *Id.* at 179-180.

While Rothschild was in his car, the Kuhn children were "banging" on the windows. *Id.* at 65-67. Rothschild did not communicate with the children even though "they were asking me things like who am I and blah blah blah." *Id.* at 68. He remained in his car for approximately half an hour before Deputy Sprouse arrived. While waiting Rothschild "reclined [his] seat and closed [his] eyes and relaxed for a little bit." *Id.* at 71.

Sprouse arrived at the Kuhn residence at 4:50 p.m. Deposition of Harold Sprouse, p. 98, attached to Declaration of Daniel R. Fjelstad as Exhibit E ("Sprouse Dep."). Sprouse moved to Lewis County following a 24 or 25 year career as an officer in Phoenix. He had begun working as a Lewis County Sheriff's Deputy on November 19, 2001. *Id.* at 5. Prior to the incident in question, Sprouse had received no training on handling child abuse or neglect cases in Washington. *Id.* at 10.

Rothschild informed Sprouse that he believed the children were living in dirty, substandard conditions with no water or heat. *Id.* at 17. Rothschild encouraged Sprouse to conduct a child welfare check. Rothschild Dep. at 73-74. Sprouse and Rothschild approached the motor home together. *Id.* at 76. Before arriving at the motor home Sprouse made contact with A.K. and noted that she appeared to be clean. There was no indication she was malnourished, bruised or cold.

ORDER- 3

Sprouse Dep. at 22-24. Sprouse observed mud and garbage outside of the motor home. He did not see a fire pit. *Id*. at 29-31. Based on the muddy surroundings, it was Sprouse's impression that the motor home was not mobile. *Id*. at 30, 54.

A.K. blocked the door to the motor home and insisted that Sprouse could not enter without a warrant. Sprouse told A.K. that he did not need a warrant because she was a minor. Declaration of A.K., p. 2, attached to Declaration of Daniel R. Fjelstad as Exhibit F ("A.K. Decl.") A.K. moved aside and Sprouse entered the motor home. *Id*. Sprouse did not consider obtaining a warrant. Sprouse Dep. at 53.

Sprouse entered the home first, followed by Rothschild and A.K. Rothschild Dep. at 83. Rothschild took a few steps into the motor home, but did not wander all the way through. *Id*. at 84-85. Sprouse conducted a full search of the motor home. *Id*. Sprouse described the interior as "extremely cluttered, nasty, filthy." Sprouse Dep. at 34. He located a marijuana bong in the bedroom and growing marijuana plants in the shower.[2] *Id*. The toilet contained feces. *Id*. Rothschild believed there was a risk of harm to the children because the "general conditions were filthy, [and] did not present space for privacy." Rothschild Dep. at 88.

Rothschild never attempted to operate any water source or electrical equipment in the motor home. *Id*. at 85-86. Sprouse was unable to draw water from the bathroom sink. Sprouse Dep. at 38. However, he did recall a light on in the motor home and he located frozen food in the freezer. *Id*. 37, 55-56. Neither Sprouse nor Rothschild asked A.K. if there was a control panel or generator to operate the water and electricity. *Id*. at 38, 56-57; Rothschild Dep., 96-97. The children did not appear to have any poor medical or physical conditions or emotional issues. Rothschild Dep. at 99. A.K. appeared capable of caring for herself and her siblings. Sprouse Dep. at 53. Nothing in the

---

[2]Leigh Ann Kuhn suffered from a severe degenerative disk disease. Robert Kuhn believed it was legal for his wife to posses marijuana in Washington because she had a statement from a doctor in Oregon. Deposition of Robert Kuhn, pp. 30-31, 52, attached to Declaration of Daniel R. Fjelstad as Exhibit A ("R. Kuhn Dep.").

ORDER- 4

motor home indicated the children were in danger of being injured in the next hour or two. *Id*. at 58.

Based upon their observations and their belief that there was no privacy, electricity, heat or running water, Rothschild and Sprouse concluded the motor home was an unsafe and unhealthy environment for the children.[3] Rothschild Dep. at 88-90, 94; Sprouse Dep. at 56. In fact, the motor home had multiple heat sources and a generator, as well as a battery bank. R. Kuhn Dep. at 36, 40-41. Despite the impressions of Rothschild and Sprouse regarding the condition of the motor home, the entire interior had been cleaned earlier that day by Leigh Ann Kuhn and her friend Kristine. *Id*. at 23.

After Sprouse completed his search of the motor home, Rothschild informed A.K. and R.K. that they were being taken into custody. He placed the two children in the back of his car and locked the doors. A.K. Decl. at 2; Rothschild Dep. at 115-117. Sprouse initially believed that Rothschild would make the removal decision. He was "surprised" to learn that in Washington, the decision is made by law enforcement. Sprouse Dep. at 11, 77; Rothschild Dep. at 109. Because his experience in Phoenix had differed, Sprouse placed a call to his supervisor to confirm Washington procedure. Sprouse's supervisor advised him to take the children if he believed there was cause. Sprouse Dep. at 45-46. Sprouse requested the assistance of another deputy. Rothschild Dep. at 130-131.

While Sprouse spoke with his supervisor, Rothschild filled out Protective Custody Orders. *Id*. at 115-116. Sprouse had never seen such forms in Lewis County. Sprouse Dep. at 49. Sprouse signed the forms without questioning Rothschild as to what he had written on the forms. Rothschild Dep. at 116. Sprouse likely did not review RCW 26.44.050 prior to signing.[4]

---

[3]Sprouse identified the heater inside the motor home as the only potential imminent risk of injury to the children. He further stated "the whole environment was a danger to anybody." Sprouse Dep. at 50-51.

[4]RCW 26.44.050 provides in pertinent part: "A law enforcement officer may take, or cause to be taken, a child into protective custody without court order if there is probable cause to believe that

ORDER- 5

Deputy Robert Bishop ("Bishop") arrived approximately 30 to 45 minutes after the children were taken into custody.[5] *Id.* at 133. Sprouse and Bishop conferred briefly before returning to the motor home and entering to take photographs. *Id.* at 134; Sprouse Dep. at 54-55. Rothschild estimated the deputies returned from the motor home in 20 to 25 minutes. Rothschild Dep. at 135. Bishop shared the opinion that the children should be taken into custody. It was Bishop's understanding that law enforcement has the authority to take children into custody without an order or warrant whenever the opinion was formed that there was abuse or neglect. Deposition of Robert Bishop, 90-91, attached to Declaration of Daniel R. Fjelstad as Exhibit O.

Shortly thereafter, Robert and Leigh Ann Kuhn[6] arrived with their eldest child N.K. Rothschild and Sprouse spoke with the Kuhns briefly, informing them that their children had been taken into custody. Sprouse Dep. at 65-66; Rothschild Dep. at 138. Sprouse did not seek to verify any of the conclusions he had reached regarding the motor home, such as the absence of water, heat and electricity. Sprouse Dep. at 66-67, 104. Robert Kuhn repeatedly asked the deputies why his children were being taken into custody. He was not provided with an explanation. R. Kuhn Dep. at 19-20. Robert Kuhn felt threatened and mistreated. Id. at 20, 51-53.[7]

## II. SUMMARY JUDGEMENT STANDARD

Summary judgment is appropriate when, viewing the facts in the light most favorable to the

---

the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order... ."

[5]Disagreeing with Rothschild's assessment, and in spite of the fact A.K. and R.K. were locked in Rothschild's vehicle, Sprouse stated at his deposition that he did not place the children into custody prior to Bishop's arrival. Sprouse Dep. at 60.

[6]Plaintiff Leigh Ann Kuhn divorced Robert Kuhn after commencement of this suit. Briefs submitted on her behalf refer to her as both Ms. Miller and Ms. Kuhn. In the interests of clarity and consistency the Court will only use the name Kuhn.

[7]Consideration of subsequent facts is not necessary for purposes of this motion.

ORDER- 6

nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

### III.  DISCUSSION

The State and County Defendants assert that they are entitled to summary judgment on all claims. The Court addresses Defendants' arguments in the discussion set forth below.

**A.  The State of Washington, Department of Social and Health Services, Is Not Subject To Suit Under 42 U.S.C. §1983.**

Plaintiff Leigh Ann Kuhn concedes this argument. Plaintiff Robert Kuhn does not address this argument in his Response. Therefore, the Motion for Summary Judgment on Plaintiffs'§1983 claims as to the State of Washington, Department of Social and Health Services [Dkt. #42] is GRANTED.

**B.  David Rothschild's Motion for Summary Judgment on the Basis of Absolute Immunity.**

As the party asserting entitlement to absolute immunity, Rothschild bears the burden of establishing the justification for such immunity. *Antoine v. Byers & Anderson, Inc.*, 408 U.S. 429, 433 (1993). The United States Supreme Court has stated that "the presumption is that qualified

ORDER- 7

rather than absolute immunity is sufficient...and [the Court] [has] been quite sparing in [their] recognition of absolute immunity." *Burns v. Reed*, 500 U.S. 478, 486-478 (1991) (internal quotation marks and citations omitted).  Among the few who traditionally receive absolute immunity are "judges, prosecutors, trial witnesses, and jurors." *Miller v. Gammie*, 335 F.3d 889, 896 (9th Cir. 2003)

The Supreme Court in *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), stated that prosecutors are absolutely immune for the initiation and presentation of the State's case.  The same type of prosecutorial immunity has been extended to social workers in the performance of functions with the "requisite connection to the judicial process." *Doe v. Lebbos*, 348 F.3d 820, 826 (9th Cir. 2003), *quoting*, *Miller* at 896.  *Miller* makes it clear that it is the specific function performed, and not the role or title of the official performing the function, that is determinative of absolute immunity. *Miller* at 897; *See also Kalina v. Flethcher*, 522 U.S. 118, 127 (1997).  In the present case, the parties disagree as to whether Rothschild's actions investigating the CPS referral constitute a function having the requisite connection to judicial proceedings.[8]

While the Ninth Circuit has recognized that social workers like Rothschild perform some functions similar to those of a prosecutor, they also perform other functions as well.  *Miller* at 896. Absolute immunity for social workers has been extended to "discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents." *Meyers v. Contra County Dept. of Social Services*, 812 F.2d 1154, 1157 (9th Cir. 1987); *Miller* at 898.  The *Meyers'* court was careful to distinguish between a social worker's activities performed as an advocate, for which there is absolute immunity, and other activities. *Meyers* at 1157; *Miller* at 896. Absent the requisite connection to the judicial process, absolute immunity is unavailable. *See Meyers* at 1158; *Miller* at 896.  Thus, "the scope of absolute immunity for social workers is extremely

---

[8]The Court acknowledges, as do the Plaintiffs, that Rothschild is absolutely immune for his decision to institute dependency proceedings.  The parties do not agree on the issue of whether the investigation is part of the initiation of dependency proceedings.

ORDER- 8

narrow." *Miller* at 898. In providing an example of the limited availability of absolute immunity for social workers, *Miller* cites a Fourth Circuit decision where the court refused to extend absolute immunity to a social worker investigating whether a removal petition should be filed. *Id.*, *citing*, *Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 135-138 (4th Cir. 1989); *See also Snell v. Tunnell*, 920 F.2d 673, 691 (10th Cir. 1990) ("...child welfare workers investigating claims of child abuse are analogous to law enforcement officers who are entitled only to qualified immunity.").[9]

In light of the fact that Rothschild arrived at the Kuhn property with nothing more than the information contained in the CPS referral, the Court believes that his primary purpose at the time was to investigate and ascertain evidence necessary to make the quasi-prosecutorial determination of whether initiation of dependency proceedings would be appropriate. As a social worker, Rothschild is entitled to absolute immunity only for those quasi-prosecutorial functions necessary to the judicial process. "A prosecutor is granted only qualified immunity, however, if he or she is performing investigatory or administrative functions, or is essentially functioning as a police officer." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003), *citing*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). At the time in question, Rothschild was acting as an investigator rather than an advocate, and as such, he is not entitled to absolute immunity. For the reasons discussed above, Defendant Rothschild's Motion for Summary Judgment on absolute immunity [Dkt. #42] is DENIED.

**C.    David Rothschild's Motion for Summary Judgment on the Basis of Qualified Immunity from Plaintiffs' Search and Seizure Claim.**

Plaintiffs' allege that Rothschild violated their Constitutional right to be free from unreasonable search and seizure.

Defendants in a §1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or Constitutional rights of which

---

[9]The Court notes that Rothschild's supervisor, Douglas Wilson, stated that "a CPS investigator is investigating similar to like a law enforcement officer does." Wilson Dep. at 44.

ORDER- 9

a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could believe his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993). However, "if a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, then that case must proceed to trial." *Id*. at 873.

In analyzing a qualified immunity defense, the Court must first determine (1) whether a Constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation of a Constitutional right is found, the Court must then ask (2) whether the right was clearly established when viewed in the specific context of the case. *Id*. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. The privilege of qualified immunity is "an immunity from suit rather than a mere defense to liability, and like absolute liability, it is effectively lost if a case is erroneously permitted to go to trial." *Id*., *quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Although qualified immunity serves to protect officials from suit, "where the facts are disputed, their resolution and determinations of credibility are 'manifestly the province of the jury.'" *Wall v. County of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004), *quoting Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002).

Rothschild concedes the facts of this case satisfy the first step in the *Saucier* analysis. Rothschild contends he is entitled to qualified immunity because Plaintiffs' Constitutional right to be free from unreasonable search and seizure was not clearly established under the second step in the *Saucier* analysis.

ORDER- 10

"A warrantless search of a house is per se unreasonable, ... and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990) (internal citations omitted).  The Ninth Circuit has held that where there has been no consent[10] and a warrant is lacking it is "'settled constitutional law that, absent exigent circumstances, police could not enter a dwelling ... even under statutory authority where probable cause existed.'"  *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999), *quoting*, *White by White v. Pierce County*, 797 F.2d 812, 815 (9th Cir. 1986).  *White* provided "binding Ninth Circuit precedent, ... which clearly established that the general law of search warrants applied to child abuse investigations." *Calabretta* at 814.

Washington law provides law enforcement officers with the authority to take "a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it was necessary to first obtain a court order... ."  RCW 26.44.050.  *White* characterized the law on searching a premises as requiring "probable cause plus exigent circumstances."  *White* at 815.  In this Court's view, the law under *White* and *Calabretta* was clearly established on January 30, 2002.  For the reasons stated above, "it would be clear to a reasonable officer that his conduct" in searching the Kuhn motor home and seizing the children "was unlawful in the situation...confronted" by Rothschild, Sprouse and Bishop.  *Saucier* at 202.

Observations made by Rothschild and Sprouse include the following: mud, garbage, nearly dark on a January day, no adults present, possibly no water or electrical hookups.  The Court does not believe that as a matter of law a reasonable officer (or social worker) confronted with such a situation could reasonably conclude that the children would be injured or could not be taken into custody if time was taken to obtain a court order or search warrant.  Unlike the *White* case, which

---

[10]Viewing the facts in the light most favorable to the Plaintiffs, A.K. did not consent to a search of the motor home.

ORDER- 11

involved allegations of abuse, Rotchschild and Sprouse observed nothing during their neglect investigation indicating the children were in poor physical condition. Sprouse noted that A.K. appeared clean, and capable of caring for herself and her siblings.[11] The Court cannot determine as a matter of law whether the requisite exigent circumstances were present to search Plaintiffs' motor home and seize their children.

Having made the preceding determination, the Court will now consider Rothschild's ancillary assertions of qualified immunity. Rothschild makes two such arguments, stating that the actions of others serve as superceding and intervening causes of Plaintiffs' alleged injuries. First, he contends that the search and seizure decision was made by law enforcement, and to impute that judgment to him would be improper. Alternatively, Rothschild argues that the order entered by Commissioner Mitchell at the shelter care hearing serves to break the causation between his conduct and any injury suffered by Plaintiffs.

The Court finds these arguments unpersuasive. As to the first, viewing the facts in the light most favorable to the Plaintiffs', there is a factual dispute as to who actually took the children into custody. Further, Rothschild followed Sprouse into the motor home after Sprouse made the legally inaccurate assertion that a warrant was not required because minors were involved. *See Calabretta*, 189 F.3d 808. By walking into the motor home, Rothschild made a warrantless entry. As to the second contention, the Court believes a jury could reasonably conclude that much of the injury Plaintiffs' assert occurred before the shelter care hearing. Regardless of Commissioner Mitchell's order, a jury could reasonably conclude that Rothchild's conduct produced the injury complained of.

For the reasons discussed above, Defendant Rothschild's Motion for Summary Judgment on qualified immunity from Plaintiffs' search and seizure claim under 42 U.S.C. §1983 [Dkt. #42] is

---

[11]Even if the Court agreed with Defendants' assertion that exigent circumstances existed to enter the motor home, Sprouse admitted that nothing within the home gave the indication the children were going to be injured in the next hour or two, the approximate time it would take to obtain a warrant or protective custody order. Sprouse Dep. at 58.

ORDER- 12

DENIED[12].

### D. Deputy Sprouse and Deputy Bishop's Motion for Summary Judgment on the Basis of Qualified Immunity from Plaintiffs' Search and Seizure Claim.

Deputy Sprouse and Deputy Bishop assert entitlement to qualified immunity on materially indistinguishable grounds from the arguments made by Defendant Rothschild. To the extent the Court finds these arguments functionally similar, the Court adopts the analysis made with respect to Rothschild's assertion of qualified immunity and applies it to Defendants Sprouse and Rothschild. The Court makes the following observations regarding novel qualified immunity assertions made by Sprouse and Bishop based upon the "police community caretaking emergency function," Washington State law and common law qualified immunity.

Having already decided that the Court cannot conclude as a matter of law that exigent circumstances existed, the Court will not consider the argument that the actions of Sprouse and Bishop are entitled to qualified immunity under the "police community caretaking **emergency** function" (emphasis added). Similarly, the Court's preceding analysis precludes Defendants Sprouse and Bishop from any entitlement to common law qualified immunity under *Gurno v. Town of LaConner*, 65 Wn.App. 218, 227 (1992). The Court has previously stated the belief that it cannot declare as a matter of law that a reasonable officer under the circumstances of this case could have reasonably concluded that the requisite exigent circumstances were present to justify the Deputies' actions. Finally, Sprouse and Bishop argue that a number of Washington statutes provide support

---

[12]Plaintiffs assert separate "family unity" claims against all individually named Defendants. The Court does not view the alleged harm under the "family unity" claim as functionally distinguishable from the harm alleged under the search and seizure claim. Therefore the Court has incorporated the "family unity" claim into the discussion of the search and seizure claim for purposes of this motion.

Furthermore, Plaintiffs assert a general due process claim. As pled, it is unclear to the Court whether this is a separate cause of action. Without ruling on the merits, and to the extent Plaintiffs plead separate due process rights and Defendants moved for summary judgment on any such claims, Defendants' motion [Dkt. #42] is DENIED WITHOUT PREJUDICE.

ORDER- 13

for their assertion of qualified immunity. This argument fails because state law cannot provide immunity from suit for federal civil rights violations. *Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir. 2000).

For the reasons discussed above, Defendants Sprouse and Bishops' Motion for Summary Judgment on qualified immunity from Plaintiffs' search and seizure claim under 42 U.S.C. §1983 [Dkt. #69] is DENIED.[13]

### E.   Negligent Training and Supervision Claim Against DSHS.

Defendant DSHS's Motion for Summary Judgment on Plaintiffs' Washington State law claim for negligent training and supervision [Dkt. #42] is DENIED WITHOUT PREJUDICE.

### F.   Negligent Training and Supervision Claim Against Lewis County Sheriff's Department.

Plaintiffs have moved to substitute Lewis County for the Lewis County Sheriff's Department. Motions to amend under Fed. R. Civ. P. 15 are liberally construed. *Martinez v. Newport Beach City*, 125 F.3d 777, 785 (9th Cir. 1997). As such, Plaintiffs' motion is [Dkts. #89 and 92] GRANTED.

Defendant Lewis County's Motion for Summary Judgment on Plaintiffs' Washington State law claim for negligent training and supervision [Dkt. #69] is DENIED WITHOUT PREJUDICE.

### G.   42 U.S.C. §1983 Custom or Policy Claim Against Lewis County

It is unclear to the Court whether Plaintiffs intended to plead a 42 U.S.C. §1983 claim against Lewis County as a separate cause of action. Without ruling on the merits, and to the extent Plaintiffs plead a separate 42 U.S.C. §1983 claim against Defendant Lewis County and Defendant moved for

---

[13]As previously stated, the Court does not view the alleged harm caused under Plaintiffs' "family unity" claim as functionally distinguishable from the harm alleged under the search and seizure claim. Therefore the Court has incorporated the "family unity" claim into the discussion of the search and seizure claim for purposes of this motion.

The Court's prior discussion of Plaintiffs' general due process claim is now adopted with respect to Sprouse and Bishop. Without ruling on the merits, and to the extent Plaintiffs plead separate due process rights and Defendants moved for summary judgment on any such claims, that motion [Dkt. #69] is DENIED WITHOUT PREJUDICE.

ORDER- 14

summary judgment on any such claim, that motion [Dkt. #69] is DENIED WITHOUT PREJUDICE.

## IV. CONCLUSION

It is therefore ORDERED that Defendants State of Washington and David Rothschilds' Motion for Summary Judgment [Dkt. #42] is GRANTED in part and DENIED in part.  The Court GRANTS as to the State of Washington, DSHS, Plaintiffs' claim under 42 U.S.C §1983.  The Motion is DENIED with respect to Rothschild's asserted entitlement to absolute and qualified immunity from Plaintiffs' claims under 42 U.S.C. §1983.  It is DENIED WITHOUT PREJUDICE on Plaintiffs' Washington State law claim for negligent training and supervision.

It is further ORDERED that Defendant Deputies Sprouse and Bishops' Motion for Summary Judgment [Dkt. #69] is DENIED as to all asserted entitlements to qualified immunity from Plaintiffs' claims under 42 U.S.C. §1983.  Defendant Lewis County's Motion for Summary Judgment [Dkt. #69] is DENIED WITHOUT PREJUDICE as to Plaintiffs' Washington State law claim for negligent training and supervision and 42 U.S.C. §1983 custom or policy claim.

It is further ORDERED that Plaintiffs' Motion to Amend contained in their response briefs to Lewis County [Dkts. #89 and 92] is GRANTED.  Lewis County shall be substituted as a party replacing the Lewis County Sheriff's Department.

DATED this 9th day of February, 2006.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER- 15